NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

KURWIN M.,
*Appellant,*

v.

DEPARTMENT OF CHILD SAFETY, S.M.,
NAVAJO NATION,
*Appellees.*

No. 1 CA-JV 20-0219
FILED 1-7-2021

Appeal from the Superior Court in Maricopa County
No. JD30216
The Honorable Todd F. Lang, Judge

**AFFIRMED**

COUNSEL

David W. Bell Attorney at Law, Higley
By David W. Bell
*Counsel for Appellant*

Arizona Attorney General's Office, Phoenix
By Doriane F. Neaverth
*Counsel for Appellee Department of Child Safety*

Rothstein Donatelli, LLP, Tempe
By April Olson, Glennas'ba B. Augborne Arents
*Counsel for Appellee Navajo Nation*

---

## MEMORANDUM DECISION

Presiding Judge James B. Morse Jr. delivered the decision of the Court, in which Judge Maria Elena Cruz and Judge Paul J. McMurdie joined.

---

**M O R S E**, Judge:

**¶1**         Kurwin M. ("Father") appeals the juvenile court's order adjudicating his child, S.M., dependent as to Father.  For the following reasons, we affirm.

### FACTS AND PROCEDURAL BACKGROUND

**¶2**         "On review of an adjudication of dependency, we view the evidence in the light most favorable to sustaining the juvenile court's findings." *Willie G. v. Ariz. Dep't of Econ. Sec.*, 211 Ariz. 231, 235, ¶ 21 (App. 2005).

**¶3**         Father and Cari T. ("Mother") are the biological parents of S.M., born March 2012 ("Child").[1]  The Child is an enrolled member of the Navajo Nation.  The Indian Child Welfare Act, 25 U.S.C. § 1901, *et seq.* ("ICWA"), governs this proceeding.

**¶4**         Father has a long criminal history and an extensive history with the Department of Child Services ("DCS").  In 2012, DCS filed a dependency petition after receiving a substantiated report that Father hit another of his children, K.M., with a belt leaving welts on his forearm and back.  Father did not engage in reunification services, but DCS reunited Mother and K.M., and dismissed the dependency.

**¶5**         In April 2015, DCS filed the first petition alleging the Child was dependent because Father abused substances, Father and Mother engaged in domestic violence, and Mother was incarcerated.  This time, Father successfully participated in reunification services, and in February 2017, the juvenile court consolidated the dependency with a pending family court matter, granted Father "sole legal and physical custody" of the Child, and dismissed the dependency.

---

[1]      Mother is not a party to this appeal.

**¶6** In December 2018, Father was arrested for criminal trespass and assault. Father and the Child were homeless after they had been evicted from their apartment and were allegedly breaking into residences, and "couch-surfing." At the time of his arrest, Father was impaired and had alcohol in his possession.

**¶7** DCS again removed the Child from Father's custody and filed a second dependency petition on the grounds of substance abuse, neglect, domestic violence, and incarceration. DCS and the Navajo Nation worked to provide Father with reunification services after Father's release from jail. However, Father failed to participate in services. After Father failed a drug test, he refused to submit to further tests. Father engaged in visitation but often verbally abused the case manager and parental aides. As visitation continued throughout 2019, the Child exhibited destructive behaviors, such as cutting up his bedsheets and setting fire to toys. The Child's counselor expressed concern that the Child could pose a risk of harm to himself and others and that the Child's fear and behaviors resulted from his belief that he may be returned to Father's care. As a result of these findings, DCS referred the Child for trauma therapy.

**¶8** In April 2019, the Child expressed fear of Father and disclosed a history of abuse to his foster parents and therapist.

**¶9** In May 2019, the juvenile court commenced the first dependency hearing. At the close of the hearing, the court granted Father a directed verdict. However, during the hearing, the case manager visited the Child at his foster placement and learned of Father's multiple acts of physical abuse. Based on this new information, DCS sought a stay of the court's order and moved to reopen the dependency and amend the petition to assert the grounds of abuse. The Child underwent a forensic physical medical exam with Dr. Kirsch. The exam's results were inconclusive, although Dr. Kirsch opined that if six months had passed since the last abuse then she would not expect to find any physical evidence.

**¶10** The Child then underwent a forensic interview at Phoenix Children's Hospital ("PCH"), and the Child again disclosed the multiple acts of abuse by Father, including beatings with a belt and an extension cord. After the interview, the DCS investigator "substantiate[d]" the abuse allegations against Father. Law enforcement filed criminal child-abuse charges against Father, but the County Attorney's Office ultimately declined to prosecute the matter.

**¶11** In June 2019, the juvenile court denied DCS's motions, dismissed the dependency, and ordered the Child returned to Father. But after a status conference, the court vacated its order and authorized DCS to take the Child into temporary custody again. DCS then filed an amended dependency petition that included the new abuse allegations.

**¶12** After a temporary custody hearing in July, the court found that, under ICWA, "active efforts were not made to prevent removal of the child," and ordered the Child returned to Father. When DCS attempted to return the Child to the apartment where Father lived, DCS discovered the Child would be sharing a couch with Father and a female occupant. During a limited walkthrough of the residence, DCS saw drug paraphernalia and Father admitted it was his. Further, the occupant leasing the apartment did not clear a criminal background check. DCS and the Child's Guardian ad Litem ("GAL") filed an emergency motion for reconsideration, which the court denied.

**¶13** During August 2019, the Child remained in DCS custody but had three visits with Father. DCS attempted, again, to return the Child in September. The case manager visited Father's new residence and learned Father shared the home with a schizophrenic roommate who slept on a cot in the living room with Father and kept a large kitchen knife under his pillow. The home was dirty with little furniture, no air conditioning, and the case manager observed 8-10 medicine bottles on the floor. Father was not named on the lease and was expected to vacate the home within 14 days. Based on these findings, DCS filed another emergency motion for custody, which the court granted.

**¶14** In October 2019, the court commenced a second dependency hearing. The court heard testimony from Father, the Child's therapist, Foster Mother, the case manager, Dr. Kirsch, a DCS investigator, the PCH interviewer, a Navajo Nation social worker, and two Phoenix police officers. The court again found that DCS had failed to make the active efforts required by ICWA but allowed DCS "additional time to meet the active efforts requirement." The court denied Father's motion for return of the Child, finding that he had failed to demonstrate that he had "stable housing" and that continued custody of the Child would likely result in serious emotional or physical damage to the Child. The court did not make dependency findings.

**¶15** In the months following the hearing, Father refused to self-refer for counseling and remained unwilling to engage in DCS-offered services, apart from visitation.

**¶16**        DCS referred the family for therapeutic visits.  However, Father missed several sessions and refused to engage in the counseling component of the sessions he attended.  The counseling was designed to work on coping skills and anger management, but Father told the therapist that he did not "need to work on anything" and that he attended to "go through the motions."

**¶17**        On several occasions, Father verbally abused the case manager and case aides.  The Child continued to express a fear of Father to both his foster placement and the case manager.  The Child also indicated he feared for the case aide's safety because she had "no backup" when alone with Father.  DCS brought in a male case-aide administrator to provide additional supervision during visits.  Father was also aggressive and verbally abusive toward the case-aide administrator, and, during one visit, threatened to "break" the case-aide.  After that incident, DCS temporarily paused in-person visits due to the COVID-19 pandemic.  The Child's behavior improved during the suspension, but regressed when visits resumed.

**¶18**        In April 2020, Father sought the Child's return.  *See* Ariz. R.P. Juv. Ct. 59.  After an evidentiary hearing, the court denied the motion, finding the Child's report of abuse and Father's displays of anger at the DCS employees made returning the Child to Father contrary to the Child's best interests.

**¶19**        At the May report and review hearing, the juvenile court determined DCS had made active efforts and that those efforts had been unsuccessful.  In June, Dr. Laird conducted a psychological assessment and best-interest evaluation.  After observing Father and the Child interact for one hour, Dr. Laird reported that Father exhibited no anger issues, appeared bonded with the Child, and it would be in the Child's best interest to be reunited with Father.

**¶20**        In July 2020, the court commenced a third dependency hearing.  The court heard testimony from Dr. Laird, Father, the ICWA case manager, and the Navajo Nation social worker, who the parties stipulated as an expert witness under ICWA.  The parties also stipulated to the juvenile court reviewing the transcripts from the October 2019 dependency hearing and the April 2020 evidentiary hearing.

**¶21**        After taking the matter under advisement, the court issued a twelve-page order adjudicating the Child dependent due to physical abuse, including "physical discipline with extension cords and belts and other

physical assaults."  The court found that DCS had proven, "by clear and convincing evidence, including the testimony from the Qualified Expert Witness, that continued custody of the child by Father is likely to result in serious emotional or physical damage to the child" and that DCS made active efforts "to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and those efforts have proven unsuccessful."

¶22        Father timely appealed and we have jurisdiction under A.R.S. §§ 8-235, 12-120.21(A)(1), and -2101(A)(1).

## DISCUSSION

¶23        We review the juvenile court's dependency order for a clear abuse of discretion and will affirm unless no reasonable evidence supports the court's findings.  *Louis C. v. Dep't of Child Safety*, 237 Ariz. 484, 488, ¶ 12 (App. 2015).  The juvenile court "is in the best position to weigh the evidence, observe the parties, judge the credibility of the witnesses, and resolve disputed facts."  *Ariz. Dep't of Econ. Sec. v. Oscar O.*, 209 Ariz. 332, 334, ¶ 4 (App. 2004).

## I.        **Sufficiency of the Evidence**.

¶24        Father asserts insufficient evidence supports the dependency finding and the allegations of abuse were too old to prove Father currently poses an imminent risk of harm to the Child.

¶25        The statutory definition of a dependent child includes one "[i]n need of proper and effective parental care and control . . . who has no parent . . . willing to exercise or capable of exercising such care and control," as well as one whose "home is unfit by reason of abuse . . . ."  A.R.S. § 8-201(15)(a)(i), (iii).  "Abuse" includes "the infliction . . . of physical injury."  A.R.S. § 8-201(2).  Additionally, ICWA requires clear and convincing evidence, "including testimony of qualified expert witnesses, that the continued custody of the child by the parent . . . is likely to result in serious emotional or physical damage to the child."  25 U.S.C. § 1912(e).

¶26        The juvenile court found "there is clear and convincing evidence that Father had physically abused the Child in the past and Father has failed to take steps to mitigate that danger."  The record evidence supports this finding.  The court heard testimony that the Child first reported the abuse in April 2019.  The Child continued to express fear of Father.  Father refused to engage in services to mitigate these concerns.  The evidence further supports the court's finding that Father's "heated conflicts"

with DCS employees in front of the Child raised "serious concerns about Father's ability to manage his anger." The court found the Child was "justifiably afraid of Father's angry outbursts and actions."

**¶27** Father argues that, even if true, the allegations of abuse are too old to support a dependency finding. *See Francine C. v. Dep't of Child Safety*, 249 Ariz. 289, 299, ¶ 28 (App. 2020) ("A child may be dependent when a parent is *currently* unwilling or unable to protect the child from abuse or neglect."). Here, although the record contains no evidence that Father abused the Child in the past two years, Father failed to complete services, acted with hostility toward DCS employees, and caused the Child to fear being alone with Father. Thus, the unresolved threat remains. *See Shella H. v. Dep't of Child Safety*, 239 Ariz. 47, 51, ¶ 16 (App. 2016) (holding that the condition causing the dependency need not be "continuous or actively occurring . . . the substantiated and unresolved threat is sufficient").

**¶28** Finally, Father argues the court should have given more credence to Dr. Laird than the ICWA case manager. Although Dr. Laird testified she believed there was no substantial risk of harm to the Child, the court was not required to credit her testimony over the case manager and the Navajo Nation social worker. On appeal, we do not reweigh the evidence. *See Oscar O.*, 209 Ariz. at 334, ¶ 4.

## II. Active Efforts.

**¶29** ICWA also requires that DCS demonstrate "that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." 25 U.S.C. § 1912(d); *accord* Ariz. R.P. Juv. Ct. 55(C). DCS is not required to provide every imaginable service to show that active efforts took place but must provide parents with the necessary "time and opportunity to participate in programs designed to help [them] become" effective parents. *Maricopa Cnty. Juv. Action No. JS-501904*, 180 Ariz. 348, 353 (App. 1994).

**¶30** As an initial matter, DCS asserts Father waived the issue by not arguing it at the juvenile court. We disagree. Father contested DCS's active efforts in his April 2020 motion to return the Child, and his pre-hearing disclosure statement for the third dependency hearing. Although Father did not address active efforts in his closing arguments at the dependency hearing, his counsel addressed it in her opening statement and cross-examined DCS's witnesses on its efforts and services. On this record, we do not find the issue waived.

7

**¶31** Father argues the ICWA case manager lacked knowledge about the case and thus failed to undertake active efforts. DCS transferred the case to the ICWA case manager in January 2020. She testified that she reviewed the file and familiarized herself with the case. Both the ICWA case manager and the Navajo Nation social worker testified to the active efforts undertaken by DCS. We defer to the juvenile court's determination of witnesses' credibility. *Gutierrez v. Gutierrez*, 193 Ariz. 343, 347, ¶ 13 (App. 1998).

**¶32** After reviewing the record, we find that reasonable evidence supports the juvenile court's active-efforts finding. In addition to the services provided before the October 2019 dependency hearing, DCS and Father participated in a psychological consultation to identify needed services. DCS provided Father with a parent aide, but Father refused to participate in any skill sessions. DCS referred Father for therapeutic visitation, but Father "advised the therapist that they [did] not need to work on anything." Father also refused to submit to drug testing or substance-abuse services. In January 2020, DCS attempted to refer Father for individual counseling by phone, but Father hung up on them. Father later claimed he would self-refer to counseling and anger management and DCS agreed to provide transportation services, but Father never self-referred. The record evidence shows DCS made active efforts even though it "cannot force a parent to participate in recommended services." *Yvonne L. v. Ariz. Dep't of Econ. Sec.*, 227 Ariz. 415, 423, ¶ 34 (App. 2011); *see Maricopa Cnty. Juv. Action No. JS-8287*, 171 Ariz. 104, 113 (App. 1991) (holding that the record supported the court's active efforts finding because "rehabilitative programs repeatedly were offered . . . yet . . . [the mother] did not take advantage of the programs").

## CONCLUSION

**¶33** For the foregoing reasons, we affirm.

